**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HON. RICHARD K. EATON, SENIOR JUDGE**

| | |
|---|---|
| _____ ) | |
| ) | |
| **JING MEI AUTOMOTIVE (USA)** ) | |
| ) | |
| **Plaintiff** ) | |
| ) | |
| v. ) | **Court No. 13-00321** |
| ) | |
| **UNITED STATES,** ) | |
| ) | |
| **Defendant.** ) | |
| _____ ) | |

---

**DEFENDANT'S REPLY MEMORANDUM IN FURTHER**
**SUPPORT OF ITS CROSS-MOTION FOR**
**SUMMARY JUDGMENT**

---

BRIAN M. BOYNTON
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

JUSTIN R. MILLER
Attorney in Charge
International Trade Field Office

AIMEE LEE
Assistant Director

EDWARD F. KENNY
Senior Trial Counsel
Civil Division, Dept. of Justice
Commercial Litigation Branch
26 Federal Plaza – Suite 346
New York, NY 10278
Attorneys for Defendant
Tel. (212) 264-0480

*Of Counsel*:
Edward N. Maurer
Deputy Assistant Chief Counsel
Office of Assistant Chief Counsel
International Trade Litigation
U.S. Customs and Border Protection

## **TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

ARGUMENT ........................................................................................................................3

    I.      THE PLASTIC AUTOMOTIVE TRIM AND HANDLE PARTS ARE "PARTS OF
           GENERAL USE" CLASSIFIABLE UNDER THE APPROPRIATE SUBHEADINGS OF
           CHAPTER 39 AS PLASTIC FITTINGS FOR COACHWORK, PLASTIC HANDLES, OR
           OTHER PLASTIC ITEMS ...................................................................................3

    II.     THE CATEGORY 1 AND 3 AUTOMOTIVE TRIM PARTS MEET THE COMMON
           MEANING DICTIONARY DEFINITIONS OF FITTING ......................................5

    III.    THE CATEGORY 2 DOOR HANDLE PARTS ARE FITTINGS ..........................................8

    IV.    AXELS ARE NOT WHEELS AND AN AXLE COVER IS NOT
           A PART OF A WHEEL..........................................................................................15

    V.     TO THE EXTENT THE AUTO PARTS ARE PARTS OF GENERAL USE AND
           CONSIDERED TO BE COMPOSITE GOODS, THE ESSENTIAL CHARACTER IS THE
           PLASTIC MATERIAL WHICH COMPRISES ITS FORM AND PROVIDES ITS
           STRENGTH AND NOT THE MATERIAL COMPRISING ITS FINISH............................17

CONCLUSION.................................................................................................................22

## **TABLE OF AUTHORITIES**

**Cases**

*The Container Store v. United States,*
   864 F.3d 1326 (Fed. Cir. 2017)..................................................................................... 10, 11

*Competitive Enterprise Institute v. National Highway Traffic Safety Administration,*
   901 F.2d 107 (D.C. Cir. 1990) ...................................................................................... 20

*Home Depot U.S.A., Inc. v. United States,*
   915 F.3d 1374 (Fed. Cir. 2019), *on remand*, 435 F. Supp. 3d 1311 (Ct. Int'l Trade 2020)................... 13

*Jarvis Clark Co. v. United States,*
   733 F.3d 873 (Fed. Cir. 1984).................................................................................... 14

*Millenium Lumber Distrib. Ltd. v. United States,*
   558 F.3d 1326 (Fed. Cir. 2009)..................................................................................... 9

*Pillowtex Corp. v. United States,*
   171 F.3d 1370, 1374 (Fed. Cir. 1999) ...................................................................... 16


**Court Rules**

USCIT Rule 56.3 ............................................................................................................. 3

**Harmonized Tariff Schedule of the United States**

General Rule of Interpretation 1 ................................................................................... 4, 18

General Rule of Interpretation 3 ................................................................................... 18

General Rule of Interpretation 3(b)............................................................................... 13, 18, 20

   Explanatory Notes (VIII) for General Rule of Interpretation 3(b)................................... 18, 19

Additional U.S. Rule of Interpretation 1(c) ................................................................... 2, 17

Chapter 39 .....................................................................................................................*passim*

   Note 2(t) to Chapter 39 .............................................................................................. 2, 15, 16

      Subheading 3923.50.00.......................................................................................... 3, 17

   Heading 3926 .............................................................................................................. 2, 5, 8

Subheading 3926.30.10 ................................................................................................3, 15

Subheading 3926.30.50 ......................................................................................................3

Subheading 3926.90.99 ...............................................................................................3 , 18

Section XV

Note 2 to Section XV .................................................................................................4, 5, 12

Note 2(c) to Section XV ....................................................................................3, 4, 5, 10, 17

Section XVII ..............................................................................................................9, 10, 16

Explanatory Note for Section XVII .........................................................................11, 12, 13

Note 2 to Section XVII ......................................................................................................8

Note 2(b) to Section XVII............................................................................................*passim*

Chapter 83 .......................................................................................................................12

Explanatory Notes for Heading 8302 ..........................................................................4, 5, 8

Explanatory Note 83.02 ...........................................................................9, 10, 11, 12, 13

Heading 8301 ...........................................................................................................10, 13

Heading 8302 ................................................................................................................*passim*

Heading 8306 ..................................................................................................................10

Heading 8308 ..................................................................................................................10

Heading 8310 ....................................................................................................4, 17, 18

Chapter 87 ................................................................................................................12, 17

Heading 8708 .....................................................................................................2, 4, 5, 17

Subheading 8708.29.50.......................................................................................................2

Subheading 8708.50...........................................................................................................17

Subheading 8708.70.60......................................................................................................16

Subheading 8708.70.6045 ...................................................................................................2, 16

Subheading 8708.99.81 ..........................................................................................................2

## **Additional Authorities**

*American Heritage Dictionary* (3d ed. 1996) ......................................................................16

*Collins English Dictionary* ...................................................................................................12

CBP Ruling HQ955987 ...........................................................................................................19

CBP Ruling HQ W967544 ........................................................................................................7

CBP Ruling N179796 ...............................................................................................................19

*Merriam-Webster Lerner's Dictionary* ..............................................................................9, 10

*Vocabulary.com Dictionary* ..................................................................................................12

*Webster's New World Dictionary, Second College Edition, (1974)* ......................................7

*Webster's New World Dictionary, Third College Edition* ...........................................5, 7, 15

*Webster's Ninth New Collegiate Dictionary* .......................................................................15

*Webster's Third New International Dictionary* ......................................................................7

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HON. RICHARD K. EATON, SENIOR JUDGE**

| | |
|---|---|
| _____ ) | |
| **JING MEI AUTOMOTIVE (USA)**　　　　) | |
| 　　　　　　　　　　　　　　　　) | |
| 　　　　**Plaintiff**　　　　　　　) | |
| 　　　　　　　　　　　　　　　　) | |
| 　　　　　v.　　　　　　　　　　) | **Court No. 13-00321** |
| 　　　　　　　　　　　　　　　　) | |
| **UNITED STATES,**　　　　　　　　) | |
| 　　　　　　　　　　　　　　　　) | |
| 　　　　**Defendant.**　　　　　　　) | |
| _____) | |

**DEFENDANT'S REPLY MEMORANDUM IN FURTHER SUPPORT OF**
**ITS CROSS-MOTION FOR SUMMARY JUDGMENT**

Defendant, the United States (the Government), submits this reply memorandum in

further support of our cross-motion for summary judgment.  For the reasons discussed in our

moving brief and set forth below, we respectfully request that the Court enter an Order: denying

plaintiff, Jing Mei Automotive (USA)'s (JMA), motion for summary judgment; granting our

cross-motion for summary judgment; and dismissing this action in its entirety.

## INTRODUCTION

At the start of this litigation the parties disputed the correct classification of thirty-three

plastic auto parts[1] imported by JMA from China.  The Amended Complaint divided the auto

parts into the following five categories or classes: (1) interior trim; (2) door handles; (3) exterior

trim; (4) mirror scalps; and (5) emblems or wheel trim.  *See* Gov. Ex.1, left three columns of

Attachment 4 of JMA, Rog. Resp.; Am. Compl.  The parties now agree that the two side mirror

---

[1]  Plaintiff at page one paragraph two of its Resp. Brief, in its introduction of the automotive
parts at issue, refers to them as "the subject plastic automotive parts."  We will refer to them by
the same description.

scalps, items of Category 4, are classifiable in Heading 8708 of the Harmonized Tariff Schedule of the United States (HTSUS).  Specifically, JMA in its moving brief indicated that it will accept the Government's classification of the mirror scalps under Subheading 8708.29.50, as "Parts and accessories ... of motor vehicles . . . : Other parts and accessories of bodies (including cabs): Other: Other."  JMA Moving Brief at 4.  Further, on March 23, 2021, JMA filed its Response in Opposition to the Government's Cross Motion.  In both its Moving Brief and Response Brief, JMA agreed that the two plastic emblems, items of Category 5, are properly classified within Chapter 39, HTSUS (articles of plastic) through a "parts of general use" analysis.  *See* JMA Moving Brief at FNs 3, 5 and JMA Resp. Brief at 21.

For twenty-eight plastic auto parts, excluding the Rear Drive Axle Cover, JMA argues for their classification pursuant to subheading 8708.99.81 as other automotive parts, precluded from classification as articles of plastic under Chapter 39 by operation of Note 2(t).[2]  Pl. Resp. at 1. As explained in our moving papers and below, the correct classification of the twenty-eight plastic auto parts of Categories 1, 2 and 3, are under Heading 3926 HTSUS, as they are precluded from classification under Heading 8708 by operation of applicable Section notes as "parts of general use."  The one remaining item at issue in Category 5 is the "Rear Drive Axle Cover" which is an aftermarket accessory component and classifiable in Chapter 39 pursuant to Additional U.S. Rule of Interpretation 1(c).  Additional U.S. Rule 1(c) directs that a provision for parts of an article shall not prevail over a more specific provision for such parts.  Here, with

---

[2]  JMA did not include any argument concerning the Category 5, Rear Drive Axle Cover in its moving papers.  Now in its Response Brief JMA claims that the Rear Drive Axle Cover should be classifiable as a "wheel cover or hub cap" pursuant to 8708.70.6045 HTSUS.  *See* JMA Resp. Brief at 19-20.  This asserted classification is not alleged in JMA's amended complaint.

regard to the Rear Drive Axle Cover, there exists a more specific provision under which this part

is classifiable, *i.e.*, Subheading 3923.50.00, HTSUS which covers plastic lids or stoppers.

JMA has not denied any of the Government's 35 statements of material facts not in issue

and summary judgment for the Government is therefore appropriate.[3]  *See* JMA Resp. to Stmt. of

Facts, Docket No. 65-4.  We set forth our response to JMA's various arguments below.

## ARGUMENT

### I.     THE PLASTIC AUTOMOTIVE TRIM AND HANDLE PARTS ARE "PARTS OF GENERAL USE" CLASSIFIABLE UNDER THE APPROPRIATE SUBHEADINGS OF CHAPTER 39 AS PLASTIC FITTINGS FOR COACHWORK, PLASTIC HANDLES, OR OTHER PLASTIC ITEMS

As explained in our moving papers, plastic parts comprising automotive trim and handle

parts are "parts of general use" classifiable pursuant to the operation of Note 2(b) of Section

XVII and Note 2(c) of Section XV under the appropriate subheadings of Chapter 39 as follows:

the fourteen Category 1 (interior trim) parts are classifiable pursuant to Subheading 3926.30.50,

HTSUS, as "Other articles of plastics . . . Fittings for . . . coachwork or the like: Other "; the one

Category 3 (exterior trim) part is classifiable pursuant to Subheading 3926.90.99 HTSUS as

"Other articles of plastics . . . Other: Other," and, the thirteen Category 2 (door handle) parts are

classifiable pursuant to Subheading 3926.30.10, HTSUS as "Other articles of plastics . . . Fittings

for . . . coachwork or the like: Handles and knobs."

The classification analysis begins with General Rule of Interpretation (GRI) 1 of the

HTSUS which provides that classification is determined according to the terms of the tariff's

---

[3]   A review of JMA's response to the Government's statement of material facts not in issue, shows that for some facts (Statements 1-27) JMA merely denies that the functions asserted by the Government are the only functions attributable to those parts. *See* JMA Resp. to Stmt. of Facts, Docket No. 65-4.  In other words, JMA still admits that the parts have the functions asserted in the Government's statements.

headings and relative section or chapter notes.  In this case, following GRI 1, it is necessary to

consider Note 2(b) of Section XVII of the tariff, because it is part of the section which includes

the Heading 8708 ("parts and accessories of . . . motor vehicles") claimed by JMA to be

appropriate for classification here.  Note 2(b) of Section XVII states that the expression "parts"

or "parts and accessories" does not apply to "parts of general use," as defined in Note 2 of

Section XV "or similar goods of plastic (Chapter 39)."  Further, Note 2(b) of Section XVII

provides that "parts of general use" covers similar goods of plastic to those of base metal

mountings, fittings and similar items for motor vehicles (Headings 8302 and 8310).

Note 2(c) of Section XV, in turn, defines "parts of general use" to include, among others,

items of Heading 8302 (base metal mountings, fittings and similar articles suitable for

coachwork) and items of Heading 8310 (base metal sign plates, name plates and similar plates).

In addition to the HTSUS, the World Customs Organization's Explanatory Notes

(Explanatory Note or EN), (the official interpretation of the HTSUS at the international level) for

Heading 8302 confirms that the heading includes "mountings and fittings for motor vehicles"

and "door handles . . . for automobiles."

Applying the relevant law noted above, CBP correctly determined that JMA's Category 1

and 3 automotive trim parts and Category 2 door handle parts were "parts of general use" under

the tariff.[4]  "[P]arts of general use" are precluded by Note 2(b) of Section XVII from

classification as "parts" or "parts and accessories of motor vehicles" of Heading 8708.  Further,

as the automotive trim and door handle parts at issue are considered plastic versions of the base

---

[4] As noted in the Introduction section, JMA already agreed that the two plastic emblems of
Category 5, are "parts of general use" properly classified by operation of Note 2(b) of Section
XVII and Note 2(c) of Section XV in Chapter 39, HTSUS (articles of plastic).  *See* JMA Moving
Brief at FNs 3, 5 and JMA Resp. Brief at 21.  The same "parts of general use" classification
analysis applicable to Category 5 emblems is also applicable to the Category 1, 2 and 3 items
still in dispute.

metal goods classifiable in Headings 8302 (mounting, fittings and similar items), pursuant to Note 2(b) of Section XVII, they are classifiable in the appropriate heading of Chapter 39, more specifically as articles of plastic of Heading 3926 HTSUS.

JMA does not challenge our basic classification analysis, but takes issue with matters that are not determinative.  Accordingly, the Court should uphold our classification of the plastic auto parts at issue here.

## II.    THE CATEGORY 1 AND 3 AUTOMOTIVE TRIM PARTS MEET THE COMMON MEANING DICTIONARY DEFINITIONS OF FITTING

Applying the analysis described above, Categories 1 and 3, covering interior and exterior automotive trim parts, meet the common and commercial meaning of fitting which leads to classification under a similar article of plastic to Heading 8302 (base metal fittings and mountings).  As more fully discussed in our moving papers, the term "fitting" is significant to the classification analysis because Note 2(b) of Section XVII (the tariff section which includes Heading 8708 covering "[p]arts and accessories of . . . motor vehicles") states that the expression "parts and accessories" does not apply to "parts of general use," as defined in Note 2 of Section XV of the Tariff.  Note 2(c) of Section XV, in turn, defines "parts of general use" as including, among others, items of Heading 8302 ("Base metal mountings, **fittings** and similar articles suitable for . . . coachwork") (emphasis added).  Gov't brief at 2-4, 6, and 22-31.  Because the term "fitting" is undefined in the tariff, it is appropriate to look to the common and commercial meaning by consulting dictionary definitions.  Additionally, the Explanatory Notes, for Heading 8302 also confirm that the heading includes "mountings and fittings for motor vehicles."

JMA does not disagree with the analytical approach to classification discussed above, but takes particular issue with our cited definitions of "fitting" as applied to the Category 1 and 3 interior and exterior trim parts.  JMA Resp. Brief at 17-19.  JMA disputes that the Category 1

and 3 trim parts at issue meet the definition of "fitting" of Heading 8302 (covering base metal

fittings and mountings) and, therefore, these plastic parts cannot be classified according to the

corresponding provision of Chapter 39.

Specifically, JMA narrowly focuses on a single definition of "fitting" from *Webster's*

*New World Dictionary, Third College Edition*, which is "a small part used to join, adjust or,

adapt, as in a system of pipes[.]"[5]  JMA Resp. Brief at 18.  JMA then argues that the interior trim

parts (Category 1) at issue which indisputably "fill[] gaps and join[] edges of various interior

surfaces and give[] the automobile its decorative finished feel i.e. chrome plated luxury"[6] fails to

meet the aforementioned definition of "fitting."  JMA Resp. Brief at 18.  JMA instead argues

that a "fitting" can only be used to describe the functional equivalent of pipe joint or a joint for a

system of pipes.  JMA claims that it is an improper expansion of the definition of "fitting" to

suggest that the term covers the automotive trim parts here, which function to fill gaps and join

edges of different panels of a dashboard or consoles.  JMA is incorrect in its narrow reading of

the term.

JMA focuses on the ending phrase from its cited definition of "fitting," which states "as

in a system of pipes" but fails to appreciate that this is but one example of things or systems of

things that "fittings" can be used to join, adjust or, adapt.  Further by emphasizing the phrase "as

in a system of pipes," JMA improperly de-emphasizes the first part of the definition, *i.e.* "a small

part used to join, adjust or, adapt."  A reasonable interpretation of JMA's cited definition shows

that the trim parts at issue are "fittings" made to each customer's specification in order to fill or

---

[5]  The Government does not dispute that this is one of the definitions of "fitting" cited by both
parties.  However "fitting" has more than one meaning.  *See* the definitions of "fitting" cited on
pages 21 and 22 of JMA's moving brief and those cited on pages 22 and 23 of the Government
cross-motion brief.

[6]  *See* Plaintiff's Response to Defendant's Statements of Material Facts Not in Issue, at
Responses 1-15.

join the customer's specific interior or exterior panels.  In this way, the trim unifies the panels of an automotive interior and exterior and adapts (making suitable for use) the sharp edges of such panels to allow for a smooth environment suitable for an automobile interior and exterior.  *See* JMA Resp. to Stmt. of Facts, Docket No. 65-4, Pltf's Category 1 and 3 photos, Docket 55-1 and 55-3, Gov. Ex. 2, Boyd Dep. 11-18; Gov. Ex. 1, Rog. Resp. at Resp 3 and 10.  Thus in the automotive world, the automotive trim parts at issue join or adapt automotive interior or exterior panel edges as deftly as pipe fittings do in the world of plumbing.  The use of the word "fitting" to describe the interior and exterior trim parts therefore, meets the definition provided by *Webster's New World Dictionary, Third College Edition*[7] as well as the number of other definitions of "fitting" cited in our cross-motion.  *See* JMA Moving Brief at 21, 22 and Govt. Brief at 22, 23.

Even JMA acknowledges that "fitting" is also defined as "1 a. something used in fitting up: accessory, adjunct, attachment" citing to *Webster's Third New International Dictionary*. JMA Resp. Brief at 21.  Moreover, we provided additional definitions of the word "fitting" in our cross-motion brief, including the definition used in HQ W967544 from *Webster's New World Dictionary, Second College Edition, (1974)*, which is "a small part used to join, adjust or, adapt, as in a system of pipes" and also adds the following meaning, "…3. [pl.] the fixtures, furnishings or decoration of a house, office, automobile, etc."  JMA in its response brief essentially ignores this aspect of the word "fitting" *i.e.,* fitting as the furnishings or decorative accessories for an automobile.  It is undisputed that the chrome-plated plastic interior and exterior trim parts besides being used as parts to join and cover gaps, are also used as decorative

---

[7]  The fact that the Category 1 and 3 interior and exterior trim parts function to join or adapt the gaps and edges between interior dashboard sections, interior console sections or exterior panels has been admitted.  *See* JMA Resp. to Stmt. of Facts, Docket No. 65-4.  *See also* FN 1 above.

elements in the motor vehicle's interior or exterior.  *See* JMA's Response to Defendant's
Statement of Facts (Docket 65-4), Gov. Ex. 5, Tubbs Dep. P. 12, Line 4-8. Gov. Ex. 5, Tubbs
Dep. P. 44, L 13-19.

Moreover, JMA erroneously contends that our reading of the Explanatory Notes is
flawed.  JMA acknowledges that the Explanatory Notes to Heading 8302 provides guidance that
"fittings" include "[o]rnamental beading strips," but then proceeds to argue against that guidance
stating that not "everything that is ornamental falls within 8302."  JMA Resp. Brief at 19.
Instead, JMA contends that the EN's use of the word "ornamental" only narrowly applies to
"beading strips."  *Id*.  The ENs provide guidance for our interpretive analysis, and the list of
exemplars in the ENs are just that, examples, and not an exhaustive list of all parts falling within
Heading 8302.  Significantly, the chrome-plated interior and exterior trim at issue here have a
commonality with decorative beading strips in that the trim pieces at issue and beading strips
both comprise decorative accessory parts of an automobile and are used to give the vehicle a
desirable finished look.

For the above reasons, this Court should reject JMA's arguments and uphold CBP's
classification of the 15 interior and exterior trim parts under Heading 3926 as articles of plastic.

### III.    THE CATEGORY 2 DOOR HANDLE PARTS ARE FITTINGS

JMA recognizes that Section XVII, Note 2 is necessary to the classification of the door
handles as issue, but argues that Heading 8302 does not apply "to all fittings and mountings of
motor cars, and not to all handles, but only to 'accessory' fittings and mounting comprising a
'general purpose' class of article."  JMA Resp. Brief at 5.  In support of its assertion, JMA relies
on the Explanatory Note and contends that "Defendant's summary judgment memorandum fails
to account for the important limiting language that qualifies key terms within [the ENs]."  JMA

Resp. Brief at 4.  JMA further claims that "[a] recurring problem with Defendant's analysis … is that it fails to consistently and correctly apply the entire Explanatory Note's context or consistently apply the many terms [*i.e.* "general purpose classes," "within such general classes," "not being parts or accessories of Section XVII," and "grip bars, rails and handles"].  JMA Resp. Brief at 5.  JMA's argument fails for several reasons.  First, the Section notes govern the legal interpretation necessary for classification of the goods here and not the Explanatory Note.  Second, an Explanatory Note cannot place limitations on the tariff's Section notes as JMA suggests, and, in fact, the Explanatory Note in fact supports our position.[8]  Third, contrary to JMA's belief, we did address the language it now takes issue with here.  Therefore, JMA's contentions are meritless.

We previously discussed all of JMA's "limitation language" from EN 83.02 in our cross-motion brief.  Gov't Brief at 22-37.  The Government's discussion and analysis cited definitions of "purpose," "general purpose" and "class" citing the definitions from *Merriam-Webster Lerner's Dictionary* which gave the following definitions and bear repeating here:

- the word "purpose" as "the reason why something is done or used: the aim or intention of something."  ("https://www.learnersdictionary.com/definition/purpose" accessed on November 12, 2020)
- the term "general-purpose" as "able to be used for many purposes: not limited to a single purpose"  (https://www.learnersdictionary.com/definition/general purpose" accessed on November 12, 2020), and,
- the word "class" as "4 a: a group of people or things that are similar in some way. - Do you have a license to drive this class of vehicle? - a new class [=kind, type] of nuclear submarine." ("https://www.learnersdictionary.com/definition/class" accessed on November 12, 2020)

---

[8] Although the Explanatory Notes are not legally binding or dispositive, they may be consulted for guidance and are generally indicative of the proper interpretation of the various HTSUS provisions." *Millenium Lumber Distrib. Ltd. v. United States*, 558 F.3d 1326, 1329 (Fed. Cir. 2009).

JMA itself in its Amended Complaint put the relevant items in "classes" by sorting the parts by similarity *i.e.* Category 1 (interior trim), Category 2 (door handles) and Category 3 (exterior trim).  Gov't Brief at 22-37. We explained how each item in Category 2, door handles are not limited to one purpose as they are used to 1) provide a decorative finished appearance, and 2) constitute the actual levers or handles of the door handle assemblies.[9]  The multiple functionalities of the Category 2 handles are undisputed.  *See* JMA's Response to Defendant's Statement of Facts (Docket 65-4).

We also discussed the phrase "not being parts or accessories of Section XVII" as part of our legal analysis and in our cross-motion.  Gov't Brief at 16-18.  As noted above, Note 2(b) to Section XVII states that the expressions "parts" and "parts and accessories" whether or not identifiable as "parts of motor vehicles" do not apply to "parts of general use" as set forth in Note 2(c) to Section XV.  Note 2(c) of Section XV states that the expression "parts of general use" means, among other things, articles of Heading 8301, 8302, 8308, or 8310 and frames and mirrors, of base metal of Heading 8306.  Articles of Heading 8302 cover base metal mountings, fittings and similar items suitable for coachwork.  Thus the phrase "not being parts or accessories of Section XVII" is part of our legal analysis and at the core of our classification of the articles at issue.

Moreover, the door handles at issue are considered "accessory" fittings and mountings, as that term is used in EN 83.02.  The Federal Circuit in *The Container Store v. United States*, 864 F.3d 1326 (Fed. Cir. 2017), recognized that the specific guidance provided by EN 83.02,

---

[9] Categories 1 and 3 automotive trim items also carry out multiple purposes or functions, *e.g.* trim pieces are used to 1) cover the gaps between portions of center console or dashboard, 2) eliminate rattles and 3) provide a decorative finished appearance.  *See* JMA's Response to Defendant's Statement of Facts (Docket 65-4).

created a binary status where merchandise is either essential to the structure of the article or an accessory fitting or mounting.  The Court discussed the meaning of Explanatory Note 83.02 in relation to Heading 8302 finding that "heading [8302] does not, however, extend to goods forming an essential part of the structure of the article, such as window frames or swivel devices for revolving chairs."  The Court, upon review of EN 83.02, observed:

> This provision draws a sharp distinction between "general purpose ... accessory fittings and mountings," which fall within the scope of heading 8302 and "goods forming an essential part of the structure of [an] article," which do not.

*The Container Store,* 864 F.3d at 1331.

The Federal Circuit further noted that door handles (similar to the Category 2 type door handles which operate a door) are not essential *to the structure of the door*, and therefore are not precluded from Heading 8302 stating:

> Explanatory Note 83.02 does not exclude from heading 8302 any mounting or fitting "essential" to an article, but instead excludes only those mountings and fittings that "form[ ] an essential part of the structure of the article." While a hinge or a knob may be essential to the operation of a door, they are not essential parts of the structure of the door itself. Items such as hinges and knobs are attached to, or placed on, a door.

*The Container Store,* 864 F.3d at 1331, 1332.

JMA cannot ignore the significance of the Federal Circuit's discussion of the meaning of EN 83.02 as it relates to door knobs or handles which are the products of Category 2 here.  As shown above, we discussed all of the "limiting language" of EN 83.02 and after thoughtful consideration found that the handles of Category 2 were not precluded.  In fact, if any party has failed to address the language of the ENs it must be JMA because it fails to counter our analysis of EN 83.02 utilizing the common meaning of the "key terms" and does not attempt to reconcile EN 83.02 with the EN for Section XVII which states in applicable part:

(2) **Parts of general use as defined in Note 2 to Section XV**, for example,

* * *

*locks, fittings or mountings for vehicle coachwork (e.g.,made up ornamental beading strips, hinges, door handles, grip bars, foot rests, window opening mechanisms), number plates, nationality plates, etc. (such goods of base metals fall in **Chapter 83**, and similar goods of plastics fall in **Chapter 39**).* (emphasis (italics) added)

JMA argues that the ENs reveal that a motor vehicle's static grip handles are the only type of "fittings" contemplated as falling within Heading 8302 and that door handle parts that are used to open and close a door are excluded.  JMA Resp. Brief at 16 -17.  Such difference is irrelevant as both static grip handles and door handles meet the definitions of "fittings" and, in some cases, "mountings."  As noted in our moving brief, both types of handles are explicitly mentioned in EN 83.02 and the EN for Section XVII, as comprising items of Heading 8302.  Gov't Brief at 8-9, 12, 19, 26, 32-34.  To claim that "door handles" is just another term for static grip handles is plainly wrong.  As stated in our cross-motion brief, the common meaning of the term "door handle" is defined as follows:

> • *Collins English Dictionary*
> (collinsdictionary.com/us/dictionary/English/door-handle accessed on November 12, 2020) states: door handle (British English) - noun – the handle that you turn or push to open a door.

> • *Vocabulary.com Dictionary*
> (vocabulary.com/dictionary/doorhandle accessed on November 12, 2020) states doorhandle 1. Noun – a knob used to release the catch when opening a door.

Gov't Brief at 34.

JMA's argument would make the term "door-handles" just a redundancy of the term grip bar violating the analogous interpretive rule against surplusage applicable to statutory interpretation.

Additionally, it makes no logical sense that automobile door handle parts, which when connected with mechanical latches enable doors to open and close, would be excluded from

Heading 8302, when the applicable ENs provide that mechanical items such as automobile "window opening mechanisms" are included in Heading 8302.  Notwithstanding that "door handles . . . for automobiles " are explicitly referenced as being included in Heading 8302 in the first textual paragraph of EN 83.02 and in the EN for Section XVII, the automobile door handles at issue certainly fit within the common traits of the exemplars set forth in paragraph (C) of EN 83.02, which include, among others items, motor vehicle grip handles, motor vehicle spring mechanisms for blinds, and motor vehicle window opening mechanisms.  The common traits being items, whether mechanical or not, used to fit up or decorate the automobile.

Further, that Heading 8302, HTSUS covers base metal handles or knobs used to open and close doors on buildings was the outcome of the classifications decision in *Home Depot U.S.A., Inc. v. United States*, 915 F.3d 1374 (Fed. Cir. 2019) and *Home Depot U.S.A., Inc. v. United States*, 435 F.Supp.3d 1311 (Ct. Int'l Trade, 2020).  As JMA correctly points out, those decisions were the result of a GRI 3(b) analysis wherein the door handles were found to be a composite good comprised of a keyed lock of Heading 8301 and a door handle (handle used to open and close a door ) of Heading 8302.  JMA Resp. Brief at 9-10.  However, the underlying position which the Federal Circuit in *Home Depot* discussed and accepted was that door handles which open and close a door are *prima facie* classifiable in Heading 8302.  The consequence of that determination for the handles at issue here, cannot be trivialized.

JMA further attempts to refute our position that the Category 2 articles are "fittings" due to certain testimony given by the Government's 30(b)(6) witness that was inconsistent with our legal position.  *See* JMA Resp. Brief at 14-17.  JMA's contention must fail as the interpretation of the relevant tariff headings and section and chapter notes, as guided by the applicable common dictionary meanings, Explanatory Notes and Federal Circuit precedent are legal

questions that are appropriately determined by the Court. These classification matters are within the purview of this Court and cannot be precluded as ". . .the court's duty is to find the correct result, by whatever procedure is best suited to the case at hand." *See Jarvis Clark Co. v. United States,* 733 F.2d 873 (Fed. Cir. 1984).

JMA also contends that the door handle parts do not meet the common meaning definition of "fittings." JMA Resp. Brief at 17. This argument is addressed above where we discuss the definitions of fitting as to Category 1 and 3 parts. Briefly, JMA's argument is undermined by the definitions of "fitting" it adopted in its moving brief (JMA Resp. Brief at 21-22) and the definitions cited in the Government cross-motion brief. Gov't Brief at 22-23. A summary of these definitions reflect that a "fitting" is not only a part, usually small, used to join, adjust, or adapt other parts, but it is also a part used in fitting up a house office or automobile such as an accessory, attachment, furnishing or decoration. A door handle used to open, close, lock and latch an automobile door is a part which is used to equip or furnish an automobile door with a suitable apparatus. Thus, the Category 2 parts of door handles unequivocally meet the definition of fittings.

Additionally, and as noted in our cross-motion, a smaller set of door handle parts at issue not only meet the definition of fittings, but also meet the definition of "mountings." Gov't Brief at 36. As the term "mountings" is part of statutory language of Heading 8302, it is necessary to consider whether any of the goods at issue are mountings. The term "mounting" ("mount") is broadly defined as a frame or support, such as, 'an undercarriage or part on which a device (as a motor or an artillery piece) rests in service,' or 'an attachment for an accessory.' *Webster's Ninth New Collegiate Dictionary*, 775-776 (1990). Gov't Brief at 23. The following three Category 2 plastic door handle parts not only meet the definition of "fittings" as discussed above, but also

the definition of "mountings": GMT900 CHASSISLH-RR CHROME, GMT900 CHASSIS-RH CHROME W/O KEY, and GMT900 CHASSIS-LHF CHROME W/KEY.  These three Category 2 plastic door handle parts are similar to goods of Heading 8302 because 1) they are fittings used to fit-up (or equip) an automobile door and 2) comprise mountings into which the handle lever is fitted and, thereafter, the combined item is mounted onto the automobile exterior door. *See* JMA's Response to Defendant's Statement of Facts (Docket 65-4) at paragraphs 24-26 and supporting evidentiary cites.  JMA chose not to refute our position that these three handle parts are also mountings of Heading 8302.

According to Note 2(b) of Section XVII, and our analysis set forth above, the 13 Category 2 door handle parts are properly classified in the provision of Chapter 39 in which they are best described.  The plastic door handle parts at issue, being "fittings" are best described by Subheading 3926.30.10, HTSUS, which provides for articles of plastic: fittings for furniture, coachwork or the like: handles and knobs.

## IV.   AXLES ARE NOT WHEELS AND AN AXLE COVER IS NOT A PART OF A WHEEL

As for the plastic Rear Drive Axle Covers of Category 5, JMA failed to make any claim regarding this item in its own moving papers.  Now in its Response Brief, JMA claims that Note 2(t) to Chapter 39 precludes the Government's asserted classification under Chapter 39 as an article of plastic.  JMA Resp. Brief at 20.  Note 2(t) of Chapter 39 states, "This chapter does not cover: . . . [p]arts of . . . vehicles of section XVII."  The exclusion provided by Note 2(t) applies only to "parts", however the axle covers are not "parts" but rather "accessories" for classification purposes.  A part is "an essential element or constituent; integral portion which can be separated, replaced, etc." *Webster's New World Dictionary,* 984 (3d College Ed. 1988).  If a part were an essential element it would be sold as original equipment with the vehicle.  An "accessory" is

defined by *American Heritage Dictionary,* 10 (3d ed.1996) as "1.a [a] subordinate or supplementary item; an adjunct; 1.b [s]omething non-essential but desirable that contributes to an effect or result." As JMA agrees, the truck axle covers are not original equipment but rather an aftermarket item which is therefore an accessory. *See* JMA's Response to Defendant's Statement of Facts (Docket 65-4) at paragraph 33. Since only "parts" and not "accessories" are precluded by Note 2(t), the axle covers are not precluded from classification pursuant to Chapter 39.

JMA further argues that the axle covers should be classifiable as a "wheel cover or hub cap" pursuant to 8708.70.6045 HTSUS. First, this asserted classification is not alleged in JMA's Amended Complaint and is asserted for the first time in its response to our cross-motion. The term "wheel cover or hub cap" only appears in the tariff at the 10 digit statistical level of JMA's newly claimed subheading and has no relevance to classification. *See Pillowtex Corp. v. United States*, 171 F.3d 1370, 1374 (Fed. Cir. 1999). The newly claimed Subheading 8708.70.60 HTSUS, covers "parts and accessories" of road wheels at the 8 digit level. The axle covers at issue are not parts or accessories of road wheels as it is agreed the Rear Drive Axle Covers protect and shield the exposed end of the truck axles, preventing road debris and water from getting into the axle. *See* JMA's Response to Defendant's Statement of Facts (Docket 65-4) at paragraph 33. If the axle cover is an accessory of anything it is an accessory of a truck axle, however we note that while Subheading 8708.50 HTSUS covers axles and parts of axles, there is no specific provision for axle accessories.

The above analysis of JMA's various claims and objections regarding the Rear Drive Axle Covers at issue demonstrates that our classification is correct. Significant to the proper analysis of the axle covers at issue is Additional U.S. Rules of Interpretation, Rule 1(c) which

states: "a provision for parts of an article covers products solely or principally used as a part of such articles but a provision for 'parts' or 'parts and accessories' shall not prevail over a specific provision for such part or accessory."  JMA abandoned any position it had regarding the Rear Drive Axle Cover by not including it in its moving papers.  Further the axle cover should not be classified as a part or accessory of anything, instead it fits within its own specific provision, *i.e.* Subheading 3923.50.00 HTSUS, which comprises "stoppers, lids, caps and other closures, of plastics."  As the axle cover at issue functions as a cover, lid or closure for the end of the axle, and is made of plastic, Additional U.S. Rules of Interpretation, Rule 1(c) requires its classification be pursuant to Subheading 3923.50.00.

**V.  TO THE EXTENT THE AUTO PARTS ARE PARTS OF GENERAL USE AND CONSIDERED TO BE COMPOSITE GOODS, THE ESSENTIAL CHARACTER IS THE PLASTIC MATERIAL WHICH COMPRISES ITS FORM AND PROVIDES ITS STRENGTH AND NOT THE MATERIAL COMPRISING ITS FINISH**

As discussed at length, classification of JMA's plastic auto parts is achieved through the application of GRI 1 as articles of plastic in Chapter 39.  JMA nevertheless takes issue with this sound legal approach and contends that our motion "should [have] include[d] a GRI 3 analysis between plastic and metal."  JMA Resp. Brief at 11.  Although we respond to JMA's assertion below, our response does not in any way detract from our position that GRI 1 governs classification in this case.  To the extent that a GRI 3 essential character analysis might apply, that analysis is only relevant: (1) after determining that the auto parts at issue are "parts of general use"; and (2) after determining that the auto parts are composite goods meaning that the parts are made of different materials which causes *prima facie* classification under two different headings.

GRI 3 applies when "goods are, *prima facie*, classifiable under two or more headings."  Under GRI 3(b) "composite goods consisting of different materials … shall be classified as if

they consisted of the material or component which gives them their essential character." The Explanatory Notes (VIII) for 3(b) provides the following guidance:

> The factor which determines essential character will vary as between different kinds of goods. It may, for example, be determined by the nature of the material or component, its bulk, quantity, weight or value, or ***by the role of a constituent material in relation to the use of the goods***.

(emphasis added). Thus, in the event the Court considers the auto parts to be composite goods, *prima facie* classifiable under two headings, *i.e.,* Heading 8302 (base metal fittings and mountings) or in Chapter 39 as similar articles of plastic, the essential character is imparted by the plastic from which the auto parts are made and not the chrome plating.

JMA's auto parts at issue were all manufactured in China utilizing an injection molding process. Gov. Ex. 2, Boyd Dep. at 12-18. This process involved injecting thermoplastics, specifically acrylonitrile butadiene styrene (ABS) or polycarbonate-ABS (PC-ABS) into a mold while under heat and pressure in order to form the part. Gov. Ex. 2, Boyd Dep. at 15-18. The molds were designed to customer specifications with an emphasis on the desired shape and features necessary for the customer's specific automotive part. *Id*. Once the parts are formed by injection molding then they go through a plating process involving palladium, copper, nickel and chrome which gives the part an overall chrome look. Gov. Ex. 2, Boyd Dep. at 11-12. One of the part designers was asked why chrome was chosen as a finish and gave the following response:

> Q. Why was chrome used on this part as opposed to some of the other texturing, painting or plastic coloring processes you described?
>
> A. Generally the industry chrome is thought of to give the appearance of a more high valued product so the highest vehicles, prestigious vehicles have a lot of chrome in them.

Gov. Ex. 5, Tubbs Dep. P. 44, L 13-19

18

Because the parts at issue are made with different materials, *i.e.* engineered plastics and finished with chrome plating, under a GRI 3(b) analysis they must be classified according to the material which gives them their essential character.  With regard to the parts at issue here, it is the highly engineered plastic resins in combination with the molds which allow for the creation of complex part forms that meet the needs of the automotive designers.  These molded plastic parts are made to fit precisely within the vehicle allowing the part to perform its given task, as well as providing the attributes of strength and durability.  In fact, one of the part designers testified regarding the engineered plastics used in the creation of the parts, stating:

> Q. Do you know what the material is that provides the strength and rigidity for this part?
>
> A. It would be the ABS itself.
>
> Q. And is that resin particularly suitable for strength and rigidity?
>
> A. Yeah, it has durability for use in the automotive.

Gov. Ex. 5, Tubbs Dep. P.19, L 6-11

The essential character of the parts at issue is revealed by the plastic's role in the use of the parts.  The significance of the engineered plastic allows the parts to be molded into various complex designs while providing the strength and durability to withstand the rigors of use.  The metal component merely provides the desirable chrome finish applied to the finished plastic part.  Thus the chrome plating is dependent on the form and surface created by plastic on which it is applied.  In other words, the plastic part would be useful in the automobile without the chrome plating, but the chrome plating would be useless without the plastic component.  This outcome is similar to the essential character analysis of chrome-plated emblems in CBP Ruling HQ 955987 and chrome-plated door handles in CBP Ruling N179796 (The essential character was

determined to be imparted by the plastic component which forms the emblem or handle itself while the metal component is merely a decorative chrome plating).

Additionally, it is the qualities of plastic component of the parts at issue here, *i.e.*, its light weight and strength that made plastic auto parts so important to the auto industry. JMA's representative testified that the auto industry switched from wholly metal parts to plastic parts (like those at issue) decades ago in order to save weight. *See* Gov. Ex. 2 Boyd Dep at P 11, Lines 17-25, P 12, Lines 1-7. Increasing the use of highly engineered plastics enabled the industry to meet federal fuel economy standards and allowed the industry to remain competitive. The case *Competitive Enterprise Institute v. National Highway Traffic Safety Administration*, 901 F.2d 107 (D.C.Cir.1990), recognized the significance of auto manufacturers reducing the weight of vehicles they produced in order to stay competitive and improve fuel economy.

> In the decade since, auto manufacturers have reduced average car weight by 1000 pounds, which along with technological changes, has resulted in nearly doubled average fuel economy. When the agency reexamined the relationship between fuel economy and vehicle size and weight in its Final Regulatory Impact Analysis for the MY 1989 CAFÉ standards ("FRIA–MY 1989"), NHTSA again concluded that vehicle weight reduction is "probably the most powerful technique for improving vehicle fuel economy.... Each 10 percent reduction in weight improves the fuel economy of a new vehicle design by approximately 8 percent."

*Id*. at 114-15 (internal citations omitted). As noted, it was the ability of manufacturers to reduce the total weight of their vehicles which allowed the industry to achieve large leaps in fuel economy. As JMA's representative testified, saving vehicle weight was the reason the auto industry switched from wholly metal parts to plastic parts decades ago. *See* Gov. Ex. 2 Boyd Dep at P 11, Lines 17-25, P 12, Lines 1-7. Accordingly, the plastic comprising the auto parts at issue provides the essential character.

Significantly, JMA recognizes the importance of the plastic involved in creating the parts at issue when JMA agreed to the classification of the Category 5 chrome-plated plastic emblems

in Chapter 39.  JMA previously conceded that the chrome-plated plastic emblems of Category 5 fall within Heading 8310 which would preclude classification under Chapter 87 by operation of Section XVII, Note 2(b) and Section XV, Note 2(c).  *See* JMA Moving Brief at footnotes 3 and 5.  The chrome-plated plastic emblems of Category 5 are, therefore, "parts of general use" excluded from classification in Heading 8708.  Significantly, JMA now agrees with the Government that the emblems are articles of plastic stating, "the subject emblems are properly classified . . . under Chapter 39, HTSUS."  *See* JMA Response Brief at 21.  Following the direction of Section XVII, Note 2(b), JMA therefore agrees that the chrome-plated plastic emblems are "similar goods of plastic (Chapter 39)" to goods falling within Heading 8310, the provision for "Sign plates, name plates, [etc.]" classifiable under Subheading 3926.90.99, HTSUS as other articles of plastics.  This concession is significant for the reason that JMA acknowledges the importance of the plastics in the auto parts at issue which supports an essential character analysis in favor of plastics.

For all the reasons noted above, it is the highly engineered plastic component of the parts at issue which give the parts their essential character, enabling them to be classified in Chapter 39.

## <u>CONCLUSION</u>

For the reasons contained in our moving papers and in this reply memorandum, we

respectfully request that judgment be entered denying JMA's motion for summary judgment,

granting the Government's motion for summary judgment, sustaining Customs' classification of

the imported articles, and dismissing this action.

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

By:    JUSTIN R. MILLER
Attorney-in-Charge
International Trade Field Office

/s/ Aimee Lee
AIMEE LEE
Assistant Director

*Of Counsel*             /s/Edward F. Kenny
Edward N. Maurer         EDWARD F. KENNY
Deputy Assistant Chief Counsel    Senior Trial Counsel
Office of Assistant Chief Counsel    Civil Division, Dept. of Justice
International Trade Litigation      Commercial Litigation Branch
U.S. Customs and Border Protection  26 Federal Plaza – Suite 346
New York, NY 10278
Attorneys for Defendant
Dated: May 13, 2021           Tel. (212) 264-0480

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HON. RICHARD K. EATON, SENIOR JUDGE**

| | | |
|---|---|---|
| | ) | |
| **JING MEI AUTOMOTIVE (USA)** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| v. | ) | **Court No. 13-00321** |
| | ) | |
| **UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## <u>CERTIFICATE OF COMPLIANCE</u>

I, EDWARD F. KENNY, a trial attorney in the Office of the Assistant Attorney General, Civil Division, Commercial Litigation Branch, International Trade Field Office, who is the attorney responsible for the Defendant's Reply Memorandum In Further Support of its Cross-Motion For Summary Judgment, relying upon the word count feature of the word processing program used to prepare the response, certify that this memorandum complies with the word count limitation under the Court's chambers procedures and contains 6,962 words.

<u>/s/ Edward F. Kenny</u>
Edward F. Kenny

Dated: May 13, 2021